HENRY J. LYNN et al. v. M. T. POLK et al.

1. ORDER OF BUSINESS. *Power of court to regulate.* · In the absence of statutory restrictions, the Supreme Court has an inherent power to regulate the order of business therein, and to advance causes of public interest on the docket.

2. ACT OF 1871. *Construction of.* The act of 1871, ch. 125, is not an enabling, but a mandatory statute. While it requires the enumerated cases to be advanced, it does not affect the exercise of the inherent power of the court as to cases other than those named.

FROM DAVIDSON.

Appeal from the Chancery Court at Nashville. A. G. MERRITT, Ch.

The defendants entered a motion to advance this cause for trial at the present term. It was argued by Mr. GEORGE GANTT and Mr. ALBERT S. MARKS for the complainants, and Mr. R. McPHAIL SMITH and Mr. THOMAS H. MALONE for the defendants.

E. H. EWING, Special J., delivered the opinion of the court.

The bill in this case was filed in the preset year in the chancery court at Nashville, by certain alleged citizens and tax-payers of the State of Tennessee, to enjoin the carrying out and enforcement of an act of the General Assembly of said State, passed at its session of 1881, entitled "An act to compromise and

settle the bonded indebtedness of the State of Tennessee." This act provided for funding all the legally issued bonds of the State except certain designated bonds, and all outstanding coupons thereon up to and including those falling due July 1, 1881. These bonds and coupons are to be funded into bonds of the State, bearing interest at three per cent., with coupons receivable for all taxes and dues to the State, except taxes for the support of the common schools and for payment of the interest on common school fund, the bonds to be styled the "Compromise Bonds of the State of Tennessee," and to have ninety-nine years to run, though redeemable at the pleasure of the State after five years; for the punctual payment of the principal and interest of said bonds, the faith, credit and honor of the State "are solemnly pledged." The Secretary of State, the Comptroller and the Treasurer are constituted a board, "to be designated a funding board," for the carrying out of this act. The funding board may sit when and where they may deem best to enable the holders of the outstanding bonds to fund the same. It is their duty to examine and audit such legally issued outstanding bonds of the State as may be presented to them for funding, and if found to be genuine to prepare the necessary compromise bonds, which, when signed by the Governor and the great seal of the State affixed thereto, and the original bonds registered in the Comptroller's office and a full memorandum of the same made by the Comptroller, and signed by the party to receive the coupon bonds, are to be delivered to such party upon his receipting

therefor. Certain compensation also is allowed for their services, to the members of the funding board.

By the general appropriation bill of the same session of the General Assembly, $1,125,000, or so much thereof as might be necessary, was appropriated to meet the coupons upon the "compromise bonds," as they might fall due for the next succeeding two years. The revenue bill of the same session fixed the State tax for the year 1881 and thereafter at 40 cents on the $100, of which 30 cents was to be for State and 10 cents for school purposes. By existing law the county courts were authorized to levy an amount annually by taxation for general purposes not to exceed the State tax, exclusive of the tax for public roads and schools. Under the revenue bill aforesaid a State tax of 40 cents on the hundred dollars has been collected, or is in process of collection, thirty cents on the dollar of which may, by the terms of the funding bill, be applied to the coupons of the compromise bonds. All of these facts appear by statements in the bill. The bill was filed before the funding board entered upon the discharge of their duties.

The grounds for injunction stated in the bill are: That the "funding act" was procured to be passed by bribery and corruption of certain members of the General Assembly; that the tax coupon feature forestalls the revenue and diverts it from current exigencies, narrowing the scope of subsequent legislation by an enactment in the form of a contract "binding the revenue and the political power of the State over to the same and directing this revenue exclusively and *prefer-*

Lynn v. Polk.

*entially* to the discharge of such contract," thereby denying to the State "that benignant supervision that will both allow and prompt her to temper and adapt her rule to the circumstances and vicissitudes which the coming years may bring"; that this same feature violates sec. 24, art. 2 of the Constitution, that "no money shall be drawn from the treasury but in consequence of appropriations made by law"; that the same feature violates sec. 12, art. 11 of the Constitution, which provides that the interest on the common school fund "shall be inviolably appropriated to the support and encouragement of common schools"; that it breaks in upon the previous revenue system, adjusted to what has heretofore been receivable for revenue, thereby amending that system, yet without referring thereto and thereby violating sec. 17, art. 2 of the Constitution; that the act amends the revenue act of 1873, which prescribes what shall be receivable for taxes, by adding the compromise coupons to the list of tax-receivables, and yet does not recite in the caption or otherwise, the title or substance of the law amended; that the act violates sec. 2, art. 2 of the Constitution, forbidding any person belonging to one department of the government from exercising any power belonging to either of the other departments; in this case the "funOing board," constituted of Secretary of State, Comptroller and Treasurer being given judicial powers, etc.; and that the Legislature (looking to the possible consumption of the revenue actually provided, by the coupon), did not make adequate provision for the ordinary expenses of the government.

The bill in conclusion prays, in case complainants are "mistaken in regard to the power and functions of the funding board, and in their construction of the act in reference to the school fund, that the same may be construed by the court, etc." The persons designated in the act by their official titles as a funding board were made defendants to the bill in their own names, thus: "M. T. Polk, J. N. Nolan and D. A. Nunn, hereinafter styled the funding board." The injunction prayed for was granted, and thereupon the defendants, having been served with process and enjoined according to the prayer of the bill, appeared in the chancery court at Nashville and moved the court to dissolve the injunction for want of equity on the face of the bill. That court dissolved the injunction and in addition, of its own motion, also dismissed complainants' bill; from the decree thus made the complainants appealed to this court at its present term, and the cause is now here upon this appeal.

But as it was manifest to the defendants from the state of the docket of Davidson county in this court, and the previous order of the court, that the cause could not be reached at the present term of the court, the defendants have applied by petition to have this cause so advanced as that it might be heard at the present term. The complainants resist the making of an order to advance the cause; they deny that it is rightfully in the power of the court to make such advance; and if within the power of the court, they deny that it is their duty or that it would be proper to do so. This court has heard argument upon these

questions and proceeds now to give an opinion upon them.

At the threshold this consideration occurs to the court. How is it that the complainants, as complainants, come to resist this application? They have not had justice dealt to them in the court below and have appealed to this court for redress. Such is their claim by their appeal. The presumption is that every man for an injury done him or threatened against him, desires to have justice administered to him without sale, denial or delay. Delay in affording relief for a grievance complained of, constitutes certainly no legitimate part of his redress. Delay is sometimes necessary even in a court of last resort, however, to the complete administration of justice, as, for instance, from the intervention of some fact between the decision of the lower court and the time for hearing in the superior one. This must appear by affidavit, and will of course receive attention by the court. Nothing of the kind is presented or pretended here. But this may be all true and yet the court may hear suggestions from any quarter in regard to its powers and the exercise of them, its duties and their obligation. The suggestions, therefore, of complainants' counsel upon these matters will be considered and dealt with by the court according to their merits.

The only parties or persons who would seem to have a *right* to complain of an advancement of this cause are the other litigants upon the docket, the hearing of whose cases may be delayed by the interjection of this one. So far as we know, these litigants do

not object, nor do we know in what form indeed they could do so. This court will always however, it is hoped, when matters touching its powers and duties are properly brought to its attention, give them due consideration; and we are of opinion that there has been no impropriety in the manner in which these questions are now presented.

What, then, in absence of positive restriction by statute, or a controlling course of decisions, would be the power of this court in regard to the order of business on its docket? The court would unquestionably have the power to try any cause brought here by appeal, at any time it should think proper, giving the parties due time for preparation, and there being no legal ground for postponement or continuance, except that the case was not regularly reached on the docket. This last would be no ground of objection so far as the parties were concerned, even if the court should act capriciously. The mere suggestion that something might occur in the future that would be beneficial or disastrous to the one or the other by trying the cause out of its order, would demand no consideration from the court. This inherent power of the court should not, however, be exercised capriciously in reference to the rights of other litigants, if there were nothing in the cause proposed to be advanced to distinguish it in character from other cases. Such a course in a court would deserve public censure, however valid its action might be in the cause thus advanced or proposed to be advanced. The position here taken, we think, cannot be successfully assailed.

Lynn *v.* Polk.

If, then, there has been no direct limitation of this power by statute and no controlling course of decision as a guide to the mode of its exercise, we shall only be left to say, in the case before us, whether it is of sufficient public importance to offer a valid reason to other suitors for a short delay in the hearing of their causes while this case is disposed of. Natural justice and the tendency of our · legislation has been toward giving a litigant a right to have his cause heard in its order in the time of his appeal. But this is not a vested right. It has no mode of assertion and is subject to be postponed to more urgent considerations. No statute has so far affected the inherent power of the court above referred to, as to require that at all events causes shall be tried in their order on the docket. The court have examined the sections of the Code referred to in the argument as possibly having some bearing upon the immediate question now under examination, but none of them reach it and they do not demand discussion. None of them undertake to regulate the order in which causes shall be taken up, when the docket of any particular county is before the court. We cite them, however, that they may be looked into, if desired, by the curious or hypercritical: Code, sec. 4505, 4505 *a;* Secs. 2945 *et seq.,* as to the lower courts; Sec. 4504, authorizing this court to make rules, and the case upon it of *Foster* v. *Burem,* 1 Heis., 784.

The cases presented from the decisions of the Supreme Court of the United States, *pro and con,* have been looked to, but nothing has been found in them

bearing by way of restriction upon the inherent power above claimed for this court.

So far as the decisions of the Supreme Court of this State in the time past are concerned, the old case of *Chrisman* v. *Curl*, 10 Yer., 488, has been referred to, and it would seem to favor the idea that the disposition of causes in courts was at the discretion of the judges. The cases of *Yost* v. *Gaines* and of *Keith* v. *Clark* (as stated by counsel, for no reference to them has been furnished to the court), seem to have been confined wholly to the construction of the act of 1871, ch. 125, and to have no bearing upon the question of the inherent power of the court now under consideration. No doubt seems to exist that this inherent power is possessed and exercised by the English Court of Chancery: See 2 Danl. Ch. Pl., 972.

Indeed it is difficult to conceive how in all the exigencies of society and government a court of last resort could answer fully the purpose of its creation without the possession of such an inherent and discretionary power. The very fact that statutes have been passed regulating in some particulars the order of business in courts, is an admission that otherwise this order would be at the legal not capricious discretion of the judges.

In this connection it may not be improper to take some notice of the act of 1871, ch. 125. It has been slightly argued that this act, even admitting that the court . previously possessed an unlimited discretionary power as to the advancement of causes, defines the power to be thereafter possessed by the court and ex-

Lynn *v.* Polk.

cludes all otner power upon the subject.    Now it is
manifest on the face of this act that it is only in-
tended to make that a duty of the court which was
before but a matter of discretion.    It it not an ena-
bling statute but a mandatory one;   there are no words
of limitation or restriction.    The rule *expressio unius,*
*exclusio alterius* has no application.

If, then, this court has the inherent discretionary
power, which from the above considerations it would
seem that it has, the question still remains, Is this a
proper case for its exercise?    Is the cause of such
public importance as to demand its speedy adjudica-
tion?    It is certainly a cause in which every citizen
of Tennessee is more or less interested, pecuniarily,
politically and as a matter of feeling.    It brings into
question the proper disposition of $1,125,000, raised
and to be raised by taxation out of the people of the
State.    It brings into question whether this shall be
applied to the payment of those who may be recog-
nized as bond creditors of the State under the funding
act, or held by the State for other purposes, or re-
turned to the people.    If not heard, it leaves at least
one half of this large sum in the hands of public offi-
cers for an indefinite period in the future and that
without any adequate security.    It leaves the creditors.
of the State whom all acknowledge to be such without
payment or settlement of their debts, or any definite
prospect in the future of such payment or settlement.
It leaves the credit and honor of the State at the
mercy of its evil-speakers every-where.    It lets loose
again among the people the flood-gates of excitement
      22—VOL. 8.

and bitterness. It breeds despair among the lovers of peace and order and quiet and progress. Such are some of the consequences which would certainly follow upon a failure of the court to hear this cause at the present term. And what legitimate reason can be offered against its being heard? That probably a few cases between individuals may fail of being heard that would otherwise be reached but for the consumption of time by this case. These individuals do not complain, and if they did their complaint could not be listened to, their rights must be held subordinate to this great demand of the public weal.

But there is an argument offered against this advancement which, from the pressing manner in which it is presented, perhaps deserves some consideiation. It is this: that should the case be advanced and the cause heard now, and as it possibly might be decided adversely to complainants the admission of bribery to the contrary notwithstanding, the people of the State would be cut off forever from an opportunity of repealing a law stained with corruption, and which for that reason whether a good or a bad law, should be repealed. Now it will be seen by the very statement of this objection that it is not an *evil* consequence that will inevitably or even probably follow the hearing of this cause at this term. It cannot be proven with anything like certainty that the law would be repealed. True, all opportunity of repeal would, in the case supposed, be lost. And we are asked, upon this suggestion of a bare opportunity for repeal of what is now *prima facie* the law of the land, and against all

the weighty reasons above-mentioned on the other side, to refuse to advance the hearing of this cause. And if we are to look at all at such future consequences of our action, we must also put into the scales this consideration: Is the law in itself a good or a bad one, without reference to the mode of its passage, being by its supposed affirmance a valid law of the land? To make this objection legitimate, speculative of future contingencies as it is, there should be at least a reasonable certainty that the delay in hearing would result in ultimate good to the State.

In our mode, however, of looking at this case future contingent consequences cannot be considered as a reason for delay. We have here on the one side a law or that which is *prima facie* a law of the land, which has in it if sustained a certainty of settling a long pending subject of agitation in the State and among its people, and on the other a charge that the supposed law was obtained by bribery, and that for this and other reasons it is not a law of the State. Now if in this state of the case the cause should be now heard and decided in favor of complainants, they will have obtained all that they can desire, the injunction will be sustained until their object, a new reference to the people, can be carried out. On the other hand, if now the case should be decided adversely to complainants the law will be affirmed, which is already *prima facie* a law of the land, and which by that decision will be declared to be and always to have been a valid law; as much so as any other law upon the statute book. It may be decided that the question

of bribery cannot be looked to, and though it existed as a fact, is as if it had never been. If such should be the decision, this consequence would follow, that the injunction in this case never should have been granted against the consummation of that which is and always was a valid law of the land; and it puts the complainants in the attitude of asking this court to keep up an injunction wrongfully obtained until they can accomplish some other ulterior object of doubtful propriety.

The reasons, then, offered against the advancement of this cause, in view of what we believe the inherent power of this court and in view of the great public importance of the case, are deemed insufficient and unsatisfactory.

But if the court should be mistaken in regard to the inherent power claimed for it, there is still another ground on which the motion to advance should be allowed. By the act of 1871, ch, 125, addenda to Code, sec. 2917 c, it is provided "that it shall be the duty of the several courts of this State to advance upon their dockets causes, the decision of which shall directly involve questions concerning the public revenues whether of the State, counties or incorporated towns or cities, etc." Now is this a case the decision of which directly involves questions concerning the public revenues of the State? If it be, it is made the imperative duty of this court to advance it. In considering this question we are to look at and construe together the "funding bill," the revenue act and the general appropriation bill of 1881, and also the

existing revenue bill of the previous year. Taking these together, it is manifest that as to the result of the funding bill, a large *definite* addition is made to the revenue to be raised in the then next succeeding two years, and that this is the basis of an appropriation of $1,125,000 in the appropriation bill for the payment of interest on the public debt. Whatever might be the decision in this case, it is clear that under the revenue bill the whole of the tax laid must be collected. If the decision should be adverse to the funding bill, the appropriation would be void and the bond creditors have no claim upon the fund. But that portion of the fund thus raised which would not be necessary for the payment of the current expenses of the government, having been raised for a void purpose, would remain in the treasury as part of the general assets of the State, or as a fund improperly raised and to be returned to those from whom it was collected. And though in the decision of this case the question as to what should be done with the fund thus remaining in the treasury does not and cannot arise, nor is any opinion intended to be expressed upon that *subject*, yet the State is directly interested in the question here, which by its decision may leave this unappropriated and undisposed of revenue in its hands, and which may or may not form a part of the general funds in its treasury. If this be so, the statute of 1871 directly applies, and our duty arises under it to advance the case. But if it be not so, we do not recognize the doctrine to the extent claimed that the revenue questions arise only in regard to the in-

coming of revenue and not as to the manner in which it is expended or to be expended. The cases of *Yost* v. *Gaines* and *Keith* v. *Clark*, so far as the recollection of the court goes, were cases in which no written opinions were given, they are not known to be reported. Nothing in regard to them has been furnished the court except the statements of counsel for complainants in argument. As recollected, they were cases of simple demands against the treasury, claiming their payment and setting up no claim to a fund that had ear-marks of revenue upon it—demands that could in no event occasion their consideration in the imposition of future taxes upon the people of the State. Whatever remarks may have been made by the court in those cases either verbally or in writing, upon the distinction between the incoming of revenue collectable, and the outgoing of money from the treasury as applied to the act of 1871, must be held to have applied only to the cases then before it and do not apply here. Here, by reference to the several acts above (to be construed together), we see a *nexus* between the incoming and outgoing of revenue of vast amount, with objects of raising clearly indicated, with appropriations specifically made, and claims to be definitely ascertained. To say then, these things considered, that the decision of this case does not directly involve questions *concerning* the public revenues would, it seems to us, be an unworthy attempt to evade our manifest duty. Certainly the decision of this case does directly *concern* the public revenues.

But beyond all this, what seems a conclusive view

Lynn *v.* Polk.

in regard to our duty under the act of 1871, is that by our decision we may declare that the State is bound as by contract under the "funding bill," and that it will be the duty of the State in the future to impose yearly taxes to meet the accruing interest upon what will have been recognized as the bonded debt of the State. How, then, can it be said that the decision of this case does not involve questions concerning the public revenues of the State, leaving out of view all other considerations above set forth on this subject.

We deem it unnecessary to consider the questions argued at the bar as to whether the "funding board" as such, or the individuals composing it, are public officers, and whether the exercise of their lawful functions is involved in the decision of this case.

Upon the whole matter, then, we are of opinion that the cause should be advanced upon the docket of Davidson county and heard at the present term.

The court all concur in the conclusion arrived at in this opinion that the cause should be advanced; but there is some difference of opinion as to some of the reasoning and reasons for the conclusion.